(109 App. Div. 201.)

### KIRKLAND v. NIAGARA GORGE R. CO.

(Supreme Court, Appellate Division, Second Department. November 24, 1905.)

1. CONTRACTS—WAIVER OF STIPULATIONS.

A traffic agreement between a navigation and a railroad company to continue for a specified time bound the navigation company to buy and pay for 2,000 tickets daily at 45 cents each. The navigation company failed to buy the designated number, and informed the railroad company of its inability to carry out the contract. The railroad company replied that there was no time in which to modify the contract, and urged the navigation company to rely on its fairness, and stated that thereafter the charge for the tickets would be 50 cents each, as the 45-cent rate was a concession on the theory that the navigation company would carry out its agreement. *Held*, that the reply was an offer to waive the stipulation requiring the purchase of 2,000 tickets daily, precluding a recovery for breach of the contract based on the failure to buy that number of tickets, on the navigation company complying with the offer and paying 50 cents for each ticket bought.

2. SAME—CONSIDERATION.

The railroad company's waiver of the stipulation was supported by a valuable consideration.

3. INTEREST—MONEY DETAINED—TIME FROM WHICH INTEREST RUNS.

Where, in an action for the sum deposited as security for the performance of a contract, there was no proof of a demand for the return of the deposit, interest could only be allowed from the date of the commencement of the action.

Appeal from Trial Term, Kings County.

Action by Robert T. Kirkland against the Niagara Gorge Railroad Company. From a judgment for plaintiff, defendant appeals. Modified.

Argued before HIRSCHBERG, P. J., and BARTLETT, JENKS, HOOKER, and MILLER, JJ.

George C. Riley, for appellant.

Harry F. Lawrence, for respondent.

HOOKER, J. Plaintiff's assignor, the International Navigation Company, on February 7, 1901, proposing to operate a line of steamships upon the Niagara river during the season of the Pan-American Exposition, entered into a traffic arrangement with the defendant the Niagara Gorge Railroad Company, which then operated a line of railroad along the lower Niagara river. This agreement provided that the navigation company should have the right to sell coupon tickets which should give the holders the privilege of riding over the defendant's line. The Navigation Company was to pay the sum of 45 cents for each coupon sold by it, payments for which were to be made daily to the defendant. The agreement was to become operative on the 1st day of June, 1901, and continue until the 1st day of October, 1901, with the privilege to the Navigation Company to continue it upon the same terms until the 1st day of November, 1901. The contract also provided:

"And in addition thereto, as a security for the performance of this contract, the Navigation Company agrees that it will deposit with the treasurer of the Gorge Company, on or before June 1, 1901, the sum of five thousand

($5,000.00) dollars in cash, or an approved surety company bond in the sum of ten thousand ($10,000.00) dollars, conditioned for the faithful performance of this contract, as the Gorge Company may elect."

The Navigation Company also agreed to purchase from the defendant at least 2,000 coupon tickets per day, and to pay for them, whether it resold the same or not, and that if the Navigation Company purchased and paid for 240,000 or more coupon tickets the defendant would rebate and pay back to it the sum of 7½ cents for each coupon ticket so purchased by it, the rebate payment to be made on the 1st day of November, 1901, or as soon thereafter as the business could be conveniently adjusted between the parties. This contract was in writing, signed and sealed by the parties thereto. On June 10, 1901, the parties by a further agreement in writing modified that of February 7th, by providing that the contract should go into effect on July 1st, instead of June 1st, and—

"That any and all tickets in excess of 180,000 which may be sold by you shall be at and after the rate of 45 cents; and that any and all tickets over our road sold by you in May and June shall be at and after the rate of 45 cents each. The guaranty shall be amended so as to be 180,000, instead of 240,000, and the rebate shall relate only to 180,000, and shall not apply to any tickets sold in excess of that number. A further condition for this modification will be that the $5,000 cash guaranty provided for by the contract shall be paid to the treasurer of the Niagara Gorge Railroad Company at once, as we understand that you are already issuing tickets with coupons over our road, and we have honored them and desire to continue to do so."

Later the sum of $5,000 mentioned in the agreements was paid over by the Navigation Company to the defendant. At the end of the season the Navigation Company owed $1,499.50 for coupons it had not paid for. It claimed to be entitled to the sum of $5,000 it had paid to the defendant, less this sum. On the defendant's refusal to pay, the claim came by mesne assignments to the plaintiff, and this action was commenced. At the close of the evidence both parties moved for a direction of a verdict, the jury was discharged, and later the court directed a verdict for $3,500.50, the difference between the amount of a deposit of $5,000 and the amount concededly owing to the defendant, together with interest on that sum from the 4th day of November, 1901. The defendant appeals from the judgment entered upon findings made and signed by the justice before whom the case was tried.

The Navigation Company failed to purchase 2,000 coupon tickets daily, or 180,000 in the aggregate, and the defendant claimed that because the Navigation Company had thereby committed a breach of the contract in that respect the defendant was entitled to keep the $5,000, for that deposit was made as security for the performance of this contract. We are persuaded, however, that during the life of the contract the defendant waived its provisions relating to the purchase of a given number of coupon tickets by the Navigation Company. As early as the 27th day of July, 1901, it was realized and discussed by letter between the parties to the contract that so far as attendance was concerned the Exposition was a failure and disappointment to every one who was dependent upon this attendance for business. On that day the manager of the Navigation Com-

pany wrote to the defendant that three weeks before that time they had informed the defendant's treasurer that they "would not go on under the 2,000 daily coupon agreement, and understood from him that your company was not thinking about that feature of our agreement, and therefore I did not deem it necessary to submit any other proposal with reference to it." The letter stated that it was an utter impossibility to think of fulfilling the 2,000 daily coupon clause of the contract, and the most they could do would be to send all the traffic they could at the flat rate, and that they would be exceedingly sorry at the end of the season to be entitled to no rebate. On September 17, 1901, the defendant wrote to the Navigation Company's manager as follows:

"At the last meeting of the board of directors I was instructed to inform you that, while there is every disposition on the part of the Niagara Gorge Railroad Company to treat your company with the utmost fairness, there is no time to further modify a written contract entered into months ago and already once modified. Our treatment of your company is a sufficient guaranty that you can depend upon fairness and reasonable treatment on a final settlement. I was instructed, however, to say to you that from this time forth we desire to have paid daily for the coupons sold over our line the sum of 50 cents, instead of 45 cents, each, as heretofore, as the 45-cent rate was a special concession on the theory that you were to carry out the written contract. In view of the fact that the written contract has not been observed on your part, this request, I am sure, will seem entirely reasonable to you. Our treasurer will be instructed to make collections accordingly. Trusting that this will be entirely satisfactory, yours," etc.

On September 19, 1901, the defendant's auditor informed the Navigation Company that commencing with the 17th of that month coupons would be rated at 50 cents, instead of 45, as theretofore. The Navigation Company paid the new rate without demur from that time until the close of the season.

We are convinced that the true interpretation of the letter of September 17th is that it evidences an intention on the part of the defendant to waive the terms of the contract theretofore in force requiring the Navigation Company to purchase 2,000 coupons daily. Although it is stated that there is no time to modify the contract of February 7th, and the Navigation Company was urged to rely on the fairness of the defendant, as that attribute had been evidenced by the past dealing between the parties, yet the letter distinctly reads, "I was instructed, however, to say to you" that henceforth the charge for tickets must be 50, instead of 45, cents each, and this "as the 45-cent rate was a special concession on the theory that you were to carry out the written contract." The only provision of the written contract to which this expression could possibly be referred was that requiring the Navigation Company to purchase and pay for 2,000 coupon tickets daily at 45 cents each. The volume of attendance at the Exposition had been disappointing, and both parties knew it. Although the Navigation Company had agreed to buy 2,000 tickets daily, it had not done so, and the defendant knew of that. Some time before July 27, 1901, the Navigation Company's manager told the defendant's treasurer that it could not go on under the 2,000 daily basis. On July 27th the Navigation Company wrote

to the defendant that it was an utter impossibility to do so; and in view of all these facts the defendant's letter of September 17th, observing that the Navigation Company had .not performed that part of its contract and that the special rate of 45 cents was made in consideration of its purchasing 2,000 tickets daily, and requiring in future the payment of 50 cents per coupon, was clearly an offer to waive the requirement of the written contract in respect of the Navigation Company's undertaking to purchase a given quantity of transportation. The Navigation Company accepted the offer, and thenceforth until the end of the season paid the full sum of 50 cents per coupon. This sum had theretofore never been mentioned in any of the written agreements between the parties, and was clearly the basis of a new modus operandi, adopted by them in view of the fact that it was apparent that the contract would not be performed.

It is perfectly apparent that the waiver was supported by abundant consideration. The Navigation Company was under no obligation to pay 50 cents per coupon. It suffered the detriment of paying an additional sum for tickets. Of course, the defendant might probably have insisted, on any day prior to the 17th of September, that the contract was no longer in force, on account of its breach by the Navigation Company's not having settled daily for at least 2,000 tickets; but it did not do so, and, on the other hand, went even so far as to refund to the Navigation Company, on August 10th, and again on September 13th, moneys on account of tickets which had been theretofore paid for, but not actually used, even though the Navigation Company was then falling so far short of buying 2,000 daily that the number of tickets for which refund was made on those days would not have brought the purchase up to the contract requirement. The language of the letter of September 17, 1901, standing alone, seems clearly to indicate an intention on the part of the defendant to waive the provision of the contract under discussion. If more were needed, the conditions which prevailed, concededly known to both parties, and the course of dealing between them, remove all doubt. The defendant makes no claim that the contract was not performed by the Navigation Company, except in respect to the volume of its purchases and its failure to pay $1,499.50 for tickets used. To the sum of $5,000, deposited by it to secure the performance, the assignee of the Navigation Company is entitled, less the charge for tickets actually used.

The judgment must, however, be modified in respect to the interest allowance. The sum of $624.21 appears to have been included in the judgment as interest on the sum of $3,500.50 from November 4, 1901; but there is no finding that the demand was made on that or any other day, and no testimony of any probative value that a demand was ever made. The man who acted as auditor for the Navigation Company, the only witness procured by the plaintiff, says that such a demand was made, but on cross-examination makes it plain that he knows nothing about it, as follows:

"Q. Now, what do you know about the demand that was made for this $5,000? A. The payment was sent to them. I was not present when a de-

mand was made. I couldn't tell you whether that demand was oral or in writing. Q. Then you are simply guessing on whether a demand was made or not, and when it was made, are you not? A. I had that from the statement of the treasurer. Q. Somebody told it? A. Yes, sir. Q. That is all you know about it, isn't it? A. Yes, sir."

Because there is no proof of demand, interest may not be had, except from the date of the commencement of the action; and the judgment must therefore be modified by deducting interest on $3,500.50 from November 4, 1901, to March 19, 1904, the date of the service of the summons and complaint, and, as so modified, affirmed, without costs to either party. All concur.